UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JENNIFER BOWMAN, and
THOMAS BOWMAN,

                                **Plaintiffs,**

   vs.
                                                      1:19-CV-00898
                                                      (MAD/CFH)

ROCKING HORSE RANCH CORP.,

                                **Defendant.**
_____

**APPEARANCES:**                                   **OF COUNSEL:**

**SCARZAFAVA, BASDEKIS LAW FIRM**      **THEODOROS BASDEKIS, ESQ.**
48 Dietz Street, Suite C                            **BRENTON P. DADEY, ESQ.**
Oneonta, New York 13820
Attorneys for Plaintiffs

**ROEMER WALLENS GOLD &**             **MATTHEW J. KELLY, ESQ.**
**MINEAUX LLP**
13 Columbia Circle
Albany, New York 12203
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    On July 24, 2019, Plaintiffs, Jennifer and Thomas Bowman, brought this action against

Defendant, Rocking Horse Ranch Corp., asserting claims for strict liability, negligence, zone of

1

danger, and loss of consortium. Dkt. No. 1. Plaintiffs' claims arise out of injuries Plaintiff Jennifer Bowman sustained during a horseback riding accident. *See id*.

On June 22, 2021, Defendant moved for summary judgment claiming that Plaintiff assumed the risk of her horse "spooking" and therefore her negligence claims are barred. *See* Dkt. No. 37. Defendant also moved for summary judgment on Plaintiff Thomas Bowman's claim for zone of danger as he did not witness the incident. *See id*. Plaintiffs filed an opposition on July 12, 2021. *See* Dkt. No. 38. Currently before the Court is Defendant's motion for summary judgment. Based on the following Defendant's motion is granted-in-part and denied-in-part.

## II. BACKGROUND

Defendant Rocking Horse Ranch is a resort in Highland, New York that provides a variety of activities, including horseback riding. Dkt. No. 37-28 at ¶ 1. On or about January 19, 2019, Plaintiffs were guests at Defendant Rocking Horse Ranch. Dkt. No. 1 at ¶ 11. Prior to her most recent stay, Plaintiff Jennifer Bowman had been to Rocking Horse Ranch on two other occasions, once in 2017 and again in 2018. Dkt. No. 37-28 at ¶ 58.

Plaintiff Jennifer Bowman rode at the beginner level on her first trip, on her second trip she rode initially at the beginner level and then at the intermediate level, and on her third trip she rode at the intermediate level. *Id*. at ¶ 62. Plaintiff Jennifer Bowman also attended an instructional class for guests about horseback riding provided by Defendant on her first, and possibly second, trip. *Id*. at ¶ 63. She did not attend on her third trip, in January 2019. *Id*.

When Plaintiffs arrived in January 2019, they were presented with and signed several documents, including the Assumption of Risk and Horseback Riding Application forms. *Id*. at ¶¶

59-61. Thereafter, Plaintiff Jennifer Bowman went on an intermediate-level horseback ride at 10:00 a.m. with her husband, Plaintiff Thomas Bowman, and her two daughters. *Id*. at ¶ 65. Following their 10:00 a.m. ride, Plaintiffs and their two daughters waited on standby to see if there was room for them on the next ride. *Id*. at ¶ 67. Plaintiffs subsequently joined the 11:15 a.m. intermediate ride while one of their daughters joined an advanced ride and the remaining daughter elected not to join any ride. *Id*. at ¶¶ 68-70.

During her 11:15 a.m. ride, Mesquite, a wrangler horse[1] from the advanced group ride, became loose while wrangler Paige Yavaniski was checking guest cinches.[2] *Id*. at ¶¶ 31, 34-36. Plaintiff saw Mesquite walk away from the advanced ride group and then several wranglers on the intermediate ride get off their horses and try to corral Mesquite. *Id*. at ¶¶ 70-71. Mesquite ran towards the riders on the intermediate ride, and Plaintiff Jennifer Bowman's horse turned away from, but was bumped by, Mesquite, who got caught in Plaintiff Jennifer Bowman's reins and pulled them away from her. *Id*. at ¶¶ 72-74. After losing the reins, Plaintiff Jennifer Bowman held onto the horn of the saddle but fell off her horse as it turned and began to run. *Id*. at ¶ 75. Plaintiff sustained a broken arm, a broken rib, and a hip contusion. *Id*. at ¶ 80.

At that same time, Plaintiff Thomas Bowman's horse was also started by Mesquite and then turned and ran a quarter of a mile back to the barn. *Id*. at ¶ 76. Plaintiff Thomas Bowman was able to remain on his horse until he reached the barn. *Id*. at ¶ 77. Plaintiff Thomas Bowman

---

[1] A wrangler horse is a horse used only by wranglers because it is best suited for a person with advanced riding skills and could not be used for any type of rider. Dkt. No. 37-28 at ¶¶ 48-49.
[2] Cinches are what hold the saddle on the horse and must always be checked, and possibly tightened, after the horse has moved for the first time. Dkt. No. 37-28 at ¶¶ 16-17.

then walked back to the location where his and his wife's horses were spooked to check on his wife and daughter.  *Id*. at ¶¶ 78-79.

Plaintiffs brought suit against Defendant claiming that it was negligent, *inter alia*, in failing to warn Plaintiffs of the risk of a horse stampede, preventing the stampede, and mitigating the stampede.  Dkt. No. 1 at ¶ 46.  Plaintiffs also brought claims for strict liability claiming that Mesquite, as well as the horses they road, Pilot and Tequila, had "vicious propensities."  *Id*. at ¶¶ 36-42.  Finally, Plaintiff Thomas Bowman brought claims for zone of danger and loss of consortium.  *Id*. at ¶¶ 49-54.  Defendants have moved for summary judgment seeking dismissal of this case in its entirety.  *See* Dkt. No. 37.

### III. DISCUSSION

**A.     Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36–37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the

nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* at 554 (quoting *Anderson*, 477 U.S. at 252) (emphasis in original). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' . . . and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quotations omitted).

**B.    Plaintiff Thomas Bowman's Zone of Danger Claim**

Plaintiff Thomas Bowman claims that during the incident, he witnessed his wife, Plaintiff Jennifer Bowman, sustain serious injuries while in the zone of danger. Dkt. No. 1 at ¶ 50. Plaintiff Thomas Bowman also claims that he suffered emotional upset, distress, shock, and fear.

5

*Id*.  Defendant has moved for summary judgment claiming that Plaintiff Thomas Bowman did not actually witness that his wife being harmed and has failed to prove any damages he actually suffered.  Dkt. No. 37-29 at 16-17.  The Court agrees.

"The zone-of-danger rule . . . allows one who is himself or herself threatened with bodily harm in consequence of the defendant's negligence to recover for emotional distress resulting from viewing the death or serious physical injury of a member of his or her immediate family."  *Bovsun v. Sanperi*, 61 N.Y.2d 219, 228–29 (1984).  "It is premised on the traditional negligence concept that by unreasonably endangering the plaintiff's physical safety the defendant has breached a duty owed to him or her for which he or she should recover all damages sustained including those occasioned by witnessing the suffering of an immediate family member who is also injured by the defendant's conduct."  *Id*.

"Stated prerequisites to maintaining this cause of action are that the plaintiff must either have witnessed or become instantaneously aware of the injury . . . and must himself have been physically in the 'zone of danger' at the time of the incident."  *Maney v. Maloney*, 101 A.D.2d 403, 404 (3d Dep't 1984) (internal citation omitted).  Where the plaintiff did not actually observe the injury inflicted upon the immediate family member, the the plaintiff must have been "instantly aware" of their serious injury because he was in the family member's presence immediately after they were harmed.  *See id*.  To be in the zone of danger, the plaintiff must have been "threatened with bodily harm in the same way as the individual ultimately injured."  *Hackert v. First Alert, Inc*., No. 1:03-CV-216, 2005 WL 8169296, *10 (N.D.N.Y. Nov. 15, 2005).

Plaintiffs' complaint and opposition fail to lend any support for Plaintiff Thomas Bowman's zone of danger claim as neither alleges a single fact relating to Plaintiff Thomas Bowman's zone of danger claim.  *See* Dkt. No. 1; Dkt. No. 38-3.  In their opposition, Plaintiffs merely state, "[i]n this case, Dr. Bowman was in the zone of danger because the horse that he was riding was involved in the stampede, placing Dr. Bowman at risk of injury.  Therefore, Dr. Bowman's zone of danger claim is viable, and summary judgment should be denied." Dkt. No. 38-4 at 18-19.  However, merely being present for the incident does not entitle Plaintiff Thomas Bowman to damages under the zone of danger theory.  *See Maney*, 101 A.D.2d at 403.

Not only does Plaintiffs' complaint not allege that Plaintiff Thomas Bowman witnessed Plaintiff Jennifer Bowman's injuries, Plaintiffs concede that when Plaintiff Thomas Bowman finally got off his horse and returned to check on his wife and daughter, he did not know what had occurred to either of them or the extent of her injuries.  Dkt. No. 37-7 at 13.

At his deposition, Plaintiff Thomas Bowman described seeing his wife's horse go out of control but then turn toward his own horse, which then accelerated toward the barn.  Dkt. No. 37-7 at 10.  The only description of Plaintiff Thomas Bowman's injuries during his deposition concerned when he returned to the location of the incident, at which time he stated that all the horses had returned to the barn.  *Id*. at 13.  It is unclear how much time had passed since the incident.  Prior to returning, Plaintiff Thomas Bowman stated that he had not "realize[d] the extent of her injuries." *Id*.  Plaintiffs have failed to claim or support that Plaintiff Thomas Bowman observed Plaintiff Jennifer Bowman's injuries or that he was instantly aware of them. *See Hackert*, 2005 WL 8169296, at *10.

Further, Plaintiff Thomas Bowman has failed to provide evidence of any emotional injuries. To recover based on zone of danger theory, "a plaintiff must establish that his emotional distress arises out of the contemporaneous observation of the serious harm to the family member and not from 'general shock and grief arising out of the loss.'" *Steinsnyder v. United States*, No. 09-CV-5407, 2013 WL 1206451, *11 (E.D.N.Y. Feb. 8, 2013) (citation omitted). Where the plaintiff does not present evidence that they sought medical or psychological treatment, the plaintiff may still be able to recover "where circumstances of negligent conduct created [a] likelihood of genuine and serious mental distress." *Id*. (quoting *Massaro v. O'Shea Funeral Home*, 292 A.D.2d 349 (2d Dep't 2002)).

Plaintiffs do not provide any evidence that Plaintiff Thomas Bowman sought medical or psychological treatment or that the circumstances of the negligent conduct created a likelihood of genuine and serious mental distress. Further, at his deposition, Plaintiff Thomas Bowman, did not detail and mental distress he felt while describing his interactions with his wife following her injuries. Dkt. No. 37-7 at 14-22.

Plaintiffs have failed to state a claim for zone of danger and similarly have failed to provide evidence supporting this claim. Defendant's motion for summary judgment on Plaintiffs' zone of danger claim is granted.

**C.     Plaintiffs' Negligence Claim**

Defendant has moved for summary judgment on Plaintiffs' negligence claim based on assumption of the risk. Dkt. No. 37-29. Plaintiffs claim that assumption of the risk is inapplicable because a horse stampede is not an inherent risk of horseback riding or, alternatively,

8

because Defendant's intervening negligence increased the risk of harm to Plaintiff Jennifer Bowman.  *See* Dkt. No. 38-4 at 7.

"A plaintiff who voluntarily participates in a sporting or recreational event generally is held to have consented to those commonly-appreciated risks that are inherent in, and arise out of, participation in the sport." *Valverde v. Great Expectations, LLC*, 131 A.D.3d 425, 426 (1st Dep't 2015) (citing *Morgan v. State of New York*, 90 N.Y.2d 471 (1997)).  "'It is not necessary to the application of assumption of risk that the injured plaintiff have foreseen the exact manner in which his or her injury occurred, so long as he or she is aware of the potential for injury of the mechanism from which the injury results.'"  *Id*. (citing *Maddox v. City of New York*, 66 N.Y.2d 270, 278 (1985)).  However, "[p]articipants will not be deemed to have assumed unreasonably increased risks."  *Corica v. Rocking Horse Ranch, Inc*., 84 A.D.3d 1566, 1567 (3d Dep't 2011) (citations omitted).

The Court agrees with the parties that *Almeida-Kulla v. Deep Hollow Ltd.*, 67 Misc. 3d 1202(A) (N.Y. Sup. Ct. 2019) is instructive on this issue.  In that case, the plaintiff was injured when she fell from a horse while participating in the defendant's horseback ride.  The plaintiff was riding in a group when one of the horses on her ride stopped to graze.  This caused the entire ride to come to a stop.  At the same time, another riding group approached the area.  The trail guide from that second group got off her horse, tied her horse to a nearby fence post, and approached the grazing horse in an effort to assist with the situation.  The trail guide's horse became loose because the knot used by the trail guide failed to adequately secure the horse and, once loose, it began to run back towards the barn.  This caused the plaintiff's horse and others in the first group

to begin running back towards the barn as well, causing the plaintiff to fall from her horse.

The trial court noted that horses acting "in an unexpected manner, which may cause the riders to be thrown[,] ... is a risk inherent in horseback riding." *Id.* at *6. However, the trial court noted that the trail guide testified that she tied her horse's reins to a fence post "'so it wouldn't run away, run back to the barn'" and that she "used a slipknot so that, if her horse pulled on the reins, the knot was 'supposed to tighten.'" *Id.* at *12-13. The court held that the trail guide "thus admitted that any attempt she made to tie up her horse failed to accomplish the very purpose for tying up the horse. Since she tied the reins to the top of the vertical post, rather than under either of the horizontal posts intersecting it, when her horse pulled on the reins, they likely slipped off the top, rather than tightening around the vertical post as she had intended." *Id.* at *13. Since the trail guide admitted that the purpose of tying her horse to the fence post was to prevent the horse from running back to the barn and that she deliberately used a slipknot so that the knot would tighten if the horse pulled against it, the court found that the fact that the horse became loose and began running back to the barn, causing the other horses to follow, was sufficient evidence that the trail guide's failure to adequately secure the horse had increased the risks of the ride to raise a question of fact on the summary judgment motion. *See id.*

Here, Plaintiffs primarily claim that a horse "stampede" is a risk that cannot be assumed. Like *Almeida-Kulla*, Plaintiffs' horses took off when Mesquite ran off. Dkt. No. 37-28 at ¶¶ 72-77. Similarly, Plaintiffs signed the Ranch's Horseback Riding Application, which states:

> **ACKNOWLEDGEMENT OF RISKS:**
> I (we) agree and understand that horseback riding may entail risks
> of injury or death. Some of those risks may include falling from a

> horse while mounting, dismounting and riding; being kicked by a horse, stepped on by a horse, thrown from a horse and/or fallen on by a horse; collisions with other riders and/or obstacles. I (we) understand that unknown or unanticipated risks may result in injury, illness or death as a result of my (our) participation in the activity.
>
> **EXPRESS ASSUMPTION OF RISK AND RESPONSIBILITY:** I understand and agree to assume responsibility for the risks of horseback riding identified herein and those risks not specifically identified. Participation in this activity is purely voluntary. No one is forcing me to participate. I verify that I am physically fit, not under the influence of alcohol or any drugs at this time and sufficiently qualified, trained and capable to participate in the activity. I assume full responsibility for myself and any of my minor children for whom I am responsible. For any bodily injury, accident, illness, death, loss of personal property and expenses thereof as a result of any accident which may occur while I participate in the activity. I understand that HELMETS ARE STRONGLY RECOMMENDED and should be worn at all times. I understand that equipment provided for my protection may be inadequate to prevent serious injury. (Assumption of Risk and Horseback Riding Application forms, Exhibit "O").

Dkt. No. 37-16 at 3. Under "HORSE RELATED ACTIVITY ADVISORIES", it states,

> Horses are unpredictable by nature, with minds of their own, as are all animals both domestic and wild. The horse is often somewhat high strung or nervous by nature. Horses are extremely strong and physically powerful. Horses are extremely heavy, weighing from 600 to 1300 pounds on the average. They call for a human being's utmost respect.
> . . .
> When a horse is frightened, angry or feels threatened it may be his instinct to jump forward or sideways or to run away from danger at a trot or gallop.

*Id.* at 4. Plaintiff Jennifer Bowman signed that she read the express assumption of risk and responsibility and initialed at the end of the horse related activity advisories. *Id.* at 3-4. Plaintiff Jennifer Bowman's horse becoming spooked is precisely the type of risk inherent in riding horses.

11

Plaintiffs, however, claim that Defendant created intervening negligence that increased the risk of harm. *See* Dkt. No. 34-8 at 7. Plaintiffs argue that they could not assume the risk that Ms. Yavaniski would fail to properly secure Mesquite while checking his cinches. *Id*. In doing so, Plaintiffs claim that Mesquite was able to get loose, walk off, and then be spooked when Ms. Yavaniski attempted to secure him, thus causing the remaining horses to stampede. *Id*.

The Court agrees that if Mesquite was able to free herself through Defendant's negligence, that would be intervening negligence increasing Plaintiffs' risk of injury and summary judgment would not be appropriate. *See Almeida-Kulla*, 67 Misc. 3d 1202(A) at *4. At the time Ms. Yavaniski checked Mesquite's cinches, there were four witnesses, Lucille Austin, the assistant stable manager at Rocking Horse Ranch, and three guests, nine-year-old A.P.; A.P.'s mother, Lindsay Poppe; and S.B., Plaintiffs' daughter. Dkt. No. 37-28 at ¶¶ 2, 35, 81-82. All four witnesses and Ms. Yavaniski were deposed and gave varying accounts of how Ms. Yavaniski was holding Mesquite's reins. *See* Dkt. Nos. 37-8; 37-9; 37-13; 37-14.

Based on the testimony, there remains a question of material fact as to whether Ms. Yavaniski was holding the reins and if her negligence caused Mesquite to be able to get loose and then run away. While Ms. Yavaniski's testimony supports that she tightly held on to Mesquite, Ms. Austin's testimony supports that she held the reins in such away that Mesquite could "easily" get away. Dkt. No. 37-9 at 40. Lindsey Poppe also described Ms. Yavaniski as having the reins on her bicep. Dkt. No. 37-13 at 28. A.P. testified that she had a clear view of Mesquite and that he did not rear or back up and, based on her view point, she would assume the reins just fell off Ms. Yavaniski's arm, allowing Mesquite to then walk away. Dkt. No. 37-14 at 18-20, 23, 30.

S.B., Plaintiffs' daughter, testified that Ms. Yavaniski had voluntarily dropped the reins and allowed Mesquite to graze before Mesquite took off running. Dkt. No. 37-8 at 18-20.[3] Additionally, the Court rejects Defendant's assertion that summary judgment is warranted because Ms. Yavaniski's holding of the reins with her bicep, rather than tying the horse to a tree or fence post, was appropriate. Dkt. No. 37-26 at 11. Bridget Brandon's report indicates that looping an arm through the reins is appropriate where the wrangler maintains control of the horse.[4] *See id*.

---

[3] Defendant has urged the Court to find S.B.'s testimony as incredible and therefore unable to create a genuine issue of material fact. Dkt. No. 37-29 at 10. S.B. testified that she was "not sure" or not "100 percent sure" to almost every question other than whether Ms. Yavaniski dropped the reins. *See id*. She didn't know where she was in the line of horses, how Ms. Yavaniski was checking the cinches, where Ms. Yavaniski was in the line, how far away Mesquite was, or how long the horse was left unattended. *Id*. at 19, 22-23, 25. S.B. said the horse had been grazing for one or two minutes, then for less than a minute. *Id*. at 22-23. S.B. was unable to answer if she was looking at the horse or if she could see Ms. Yavaniski from her horse. *Id*. at 22-23. Later, she testified that she "was mainly watching the wrangler." *Id*. at 31. However, "[i]t is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment." *Cruz v. Church*, No. 9:05-CV-1067, 2008 WL 4891165, *4 (N.D.N.Y. Nov. 10, 2008) (citing *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. Mar. 29, 2007)). "Granted, there is a narrow exception to this well-established rule" where the "testimony by a non-movant that possesses the following two characteristics: (1) it constitutes almost the exclusive basis for a disputed issue of fact in the case . . . and (2) it is so lacking in credibility . . . that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant." *Id*. (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)). However, the Court is unable to locate any authority that this exception has been applied to non-party testimony. Further, "the circumstances giving rise to this exception are 'rare'" and the Court is unwilling to apply that exception here. *Id*. (quoting *Jeffreys*, 426 F.3d at 554).

[4] Plaintiffs request that the Court exclude Defendant's expert testimony because the reports fail to comply with Rules 702 and 703 of the Federal Rules of Evidence. Dkt. No. 38-4 at 18-25. To the extent Plaintiffs seek to strike these reports, Plaintiffs should have made a formal motion to do so. Regardless, the reports discuss the appropriateness of Ms. Yavaniski securing Mesquite by holding the reins with her biceps rather than tethering Mesquite to a tree or fence post. *See* Dkt. No. 37-25; Dkt. No. 26. The reports are based on the assumption that Ms. Yavaniski in fact held the reins and adequately secured Mesquite while checking the cinches. Dkt. No. 37-25 at ¶ 11; Dkt. No. 26 at 3, 10-12. However, the Court does not reach a conclusion as to whether this is an appropriate procedure because, as noted, there is evidence to demonstrate that Ms. Yavaniski was

However, the testimony of Ms. Austin and A.P. indicate that Ms. Yavaniski held Mesquite in a way that allowed Mesquite to "easily" walk away. Dkt. No. 37-9 at 40; Dkt. No. 37-14 at 18-20, 23, 30. Clearly, there is a question of material fact as to whether Ms. Yavaniski was negligent in how she held Mesquite while she checked the cinches and thus created an increased negligence that Plaintiffs could not assume. Defendant's motion for summary judgment is therefore denied.

### D.     Plaintiffs' Strict Liability Claim

Defendant has moved for summary judgment regarding Plaintiffs' strict liability claims.[5] Plaintiffs claim that Defendant is strictly liable because Mesquite, Pilot, and Tequila had vicious propensities and Defendant had knowledge of such propensities. Dkt. No. 1 at ¶¶ 37-42.

"For at least [200] years . . . the law of this state has been that the owner of a domestic animal who either knows or should have known of that animal's vicious propensities will be held liable for the harm the animal causes as a result of those propensities." *Collier v. Zambito*, 1 N.Y.3d 444, 446 (2004) (citations omitted). "Vicious propensities include the 'propensity to do

---

negligent in how she held the reins such that Mesquite was not secured and could easily walk away. The question of material fact as to whether Mesquite was essentially free to walk away precludes summary judgment and there is no need to examine whether tethering Mesquite to a tree or fence post would have been more appropriate, because even if a bicep hold was an appropriate procedure, there is evidence to suggest that Ms. Yavaniski was negligent is doing so. Therefore, this issue is moot. *See Dewitt Stern Grp., Inc. v. Eisenberg*, 257 F. Supp. 3d 542, 592 (S.D.N.Y. 2017) (finding the defendant's motion to exclude the plaintiff's expert report moot where the defendant's motion to dismiss was already granted).

[5] Defendant raises this argument for the first time in its reply. Dkt. No. 39-2 at 1-2. The issue was first raised, however, by Plaintiffs in their opposition. Dkt. No. 38-4 at 18. Further, the evidence in support of this claim was submitted in Defendant's motion for summary judgment. *See* Dkt. No. 37. Therefore, Plaintiffs will not suffer any prejudice by the Court examining Defendant's argument. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (holding that the plaintiff was not prejudiced by the court examining an issue raised only in a summary judgment reply where the plaintiff knew of the argument and also did not attempt to file a sur-reply).

any act that might endanger the safety of the persons and property of others in a given situation.'" *Id*. (quoting *Dickson v. McCoy*, 39 N.Y. 400, 403 (1868)). "Knowledge of vicious propensities may of course be established by proof of prior acts of a similar kind of which the owner had notice." *Id*. 446-47 (citing *Benoit v. Troy & Lansingburgh R.R. Co*., 154 N.Y. 223, 225 (1897)).

Vicious propensities exist where "an animal that behaves in a manner that would not necessarily be considered dangerous or ferocious, but nevertheless reflects a proclivity to act in a way that puts others at risk of harm . . . albeit only when such proclivity results in the injury giving rise to the lawsuit." *Id*. at 447.

Plaintiffs claim that Mesquite's vicious propensity was that he was a "'hot' or 'up' horse who was 'very moody', 'very unpredictable', and known to 'act up' and buck when unhappy." Dkt. No. 38-4 at 18. Vicious propensities concern behaviors, not personality traits. *See Collier*, 1 N.Y.3d at 447. The only behavior Plaintiffs highlight is bucking. Further, Plaintiffs claim that Mesquite did not buck, but that she walked away, or was left unattended, and simply spooked and ran off which caused Plaintiffs' horses became spooked. Plaintiffs' strict liability claims must fail because they fail to claim that a vicious propensity caused their injuries. *See Bloomer v. Shauger*, 94 A.D.3d 1273, 1275 (3d Dep't 2013) (holding that the horse's anxious behaviors were not vicious propensities because they did not result in the plaintiff's injuries and the horse pulling her head back, "which undeniably was the specific act that caused plaintiff's injury, constituted 'normal behavior for any horse . . . And, as noted previously, normal or typical animal behavior is not indicia of a vicious propensity'").

The parties limit their discussion to Mesquite and do not discuss any vicious propensities of Pilot or Tequila.  It is unclear whether all materials obtained in discovery are before the Court and therefore granting summary judgment on Plaintiffs' strict liability claims as to these horses would be inappropriate.  *See First Fin. Ins. Co. v. Allstate Interior Demolition Corp*., 193 F.3d 109, 115 (2d Cir. 1999).  Thus, summary judgment is granted on one of Plaintiffs' three claims for strict liability and denied to the extent Defendant moves for summary judgment as to the alleged vicious propensities of Pilot and Tequila.[6]

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's Motion for Summary Judgment (Dkt. No. 37) is **GRANTED-in-part and DENIED-in-part**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.[7]

**IT IS SO ORDERED.**

Dated: August 26, 2021
       Albany, New York

*/s/ Mae A. D'Agostino*
Mae A. D'Agostino
U.S. District Judge

---

[6] While Defendant has not raised any claims regarding the viability of Plaintiffs' strict liability claim as to Pilot or Tequila, the Court has serious doubts regarding the viability of these claims. Specifically, the Court notes that the manner in which Plaintiff Jennifer Bowman was injured does not appear to be in any way proximately caused by the "vicious propensities" of these horses.  *See Bloomer*, 94 A.D.3d at 1275-76.

[7] Following the Court's decision, Plaintiffs' zone of danger claim is dismissed as well as the strict liability claims regarding Mesquite.  Plaintiffs' negligence claim, loss of consortium claim, and strict liability claims as to Pilot and Tequila remain.